# Enders and Hynes *against* John and Joshua Swayne.

CHANCERY.

[Mr. Owsley for plaintiffs : Messrs. Crittenden and Cates for defendants.]

FROM THE CIRCUIT COURT FOR HICKMAN COUNTY.

Chief Justice ROBERTSON delivered the Opinion of the Court.

*April* 10.

CONSIDERING the peculiar nature and great number of facts exhibited in this case, it seems to this Court, that they might have been presented in such a manner as to have left no difficulty in determining as to, either the alleged resulting trust, or fraud.

But, in the preparation of the case, some of the most important and characteristic facts have been permitted to appear in a very vague and indeterminate aspect. And therefore, this Court has been subjected to some embarrassment in deducing from the entire record before it, a proper and satisfactory judicial conclusion concerning the matters litigated.

After a careful analysis, however, of all the circumstances, we are strongly inclined to think, that they conduce decidedly to the conclusion that, at least, some of the estate pursued by the bill, should be subjected to the execution of the complainants.

1. Though John Swayne had been doing business extensively, and had bought a large assortment of merchandize, and much real estate, his whole stock of goods and movable property appear to have suddenly vanished, without any account of the cause or manner of their disappearance; and, in the space of a few months after he had cause to apprehend a suit by one of his many creditors, an execution against him was returned " *no property.*"

2. It would seem that the legal title to all the real estate bought by John Swayne, and which was various and apparently extensive, passed, within a few months, into the hands of his brother Doctor Joshua Swayne, a

*Marginal note:* Certain conveyances held—upon the facts recited—to have been made, either to hinder and delay creditors, or upon a secret general trust for the use of the grantor, and the lands therefore subject to the grantor's debts.

young and single man, then but recently settled at Columbus.

3. No title passed to Joshua Swayne until the 1st of March, 1834, when John Swayne, as we are bound to infer, had just ascertained that, in consequence of Grayham's failure to remit to New York the funds deposited with him for paying the said John's mercantile creditors in that city, his credit was so far impaired as to force him to wind up his business, and either appropriate his property to the payment of his debts, or otherwise dispose of it. And though his answer claims credit for a peculiar anxiety to pay the debt due to the assignors of the complainants, and shows, we think, an undoubted ability to do so, yet it shows, also, that he ascribed to their refusal to indulge him longer, that eventful crisis in his affairs which eventuated in his ceasing to do business as a merchant, and his getting rid of all his estate, without either paying the complainants and other creditors, or being subjected to the perils of a sale of one particle of his property under execution.

4. It would seem that the first conveyance to Joshua Swayne (to wit, of the mill property) included all the real estate to which John Swayne then held a legal title. That conveyance was made at a suspicious and trying moment, and when the conveyee was in the city of New York; and it recites a consideration of five thousand six hundred dollars, when the answers aver that the true consideration was only three thousand nine hundred dollars; and the strange fact, that the vendor, in the absence of the vendee, inserted and acknowledged a larger consideration than had been given, has not been explained; and moreover, the mills seemed to be considered unproductive property; and therefore, it is somewhat singular, that Doctor Joshua Swayne should desire to own them, and should select them in payment of a *bona fide* debt due to him, and which might have been otherwise paid or secured.

5. The answers insist that a portion of the alleged consideration of three thousand nine hundred dollars, (but what portion we are not told,) was an old debt said to have been due from John to Joshua, for money loaned

to the former, by the guardian of the latter, about eighteen years before. But how much was thus due, where loaned, why it was never before paid, how Joshua became entitled to the money, where his guardian resided, whether John had given a bond for the money, or what had become of the bond, are all facts unestablished in the record. And John's answer, not only does not intimate how much of that debt was included in the consideration of three thousand nine hundred dollars, but he leaves the amount of the debt itself *a blank!* In such a case, and under such circumstances as had appeared conducing to a strong suspicion of fraud, it would have been but natural that parties, insisting on such a consideration as the guardian's old and indefinite loan, should have proved the facts necessary to establish the existence and amount of that alleged indebtedness; and the failure to do so, tends strongly to the impeachment of the deed of March, 1834.

6. Although the answers insist that John was largely indebted to Joshua, for money loaned at various times, and although two witnesses testify to the same effect in general terms, yet no account has been exhibited, and the answers themselves do not even intimate the particular items or the aggregate amount; nor suggest how much of it was applied as the consideration of one single conveyance to Joshua. Can it be presumed that no account was kept, or that neither John nor Joshua knew the state of the account, or the precise manner in which it had been adjusted? Or must we believe that the omission to state or exhibit any account or even to suggest any particulars in the answers, was the result of ignorance, carelessness or accident? Such an omission in such a case, must be deemed very unfavorable to the defence relied on in the answers, and strongly indicative of collusion and fabrication.

7. John Swayne does not, in his answer, respond at all to the question whether he had not money enough to pay his debts, nor directly to the question whether moneys, said to have been advanced to him by Joshua, had not been refunded. And if he had money enough to pay his debts, that fact alone would tend, in some degree,

vm. 14

to the conclusion that the conveyance from John to Joshua, was colorable, or under a secret trust.

The foregoing are the principal facts conducing to establish fraud or a general trust. And they are, in our opinion, too strong to be overruled, or even counterbalanced, by any allowable inference from the vague evidence as to advances made by Joshua to John Swayne, unexplained by the answers, and unapplied to any of the conveyances, either by the answers or by the proof.

We are therefore of the opinion that, so far as the complainants, as judgment creditors of John Swayne, are concerned, the conveyance by the said John to Joshua Swayne, of March the 1st, 1834, should be deemed not to have exempted the estate so conveyed from execution upon the judgment against John.

We are also of the opinion, that the hundred and fifty acres of land bought from Cates by John Swayne, and paid for with his property, should be considered as held in trust for John, or for his creditors; for even if the conveyance of that hundred and fifty acres to Joshua was not fraudulent in fact, still as there is no proof that Joshua ever refunded to John the consideration which the latter had paid to Cates, the trust resulting to John from the payment by him, remains unrebutted.

But, as to the lots conveyed to Joshua Swayne by Tipton, by Brown, by Buckner, Cates and Taylor, by Gatlin, by Peak, by Curd, and by the trustees of Columbus, we are of the opinion that the bill and exhibits do not establish such facts as should subject any of those lots in this case. As to many of them, the bill contains no definite or tangible allegation; and as to others, the proof is so slight as to the payment of the consideration by John Swayne, and the amount which seems to have been certainly paid by him, was so small, that we are disposed to think a resulting trust is not sufficiently established, and that the general proof as to advances made by Joshua to John, should counteract any deduction of trust or fraud, and leave the matter in great doubt at least.

We feel therefore indisposed to a reversal of the decree, so far as it dismissed the bill as to all the property

except that contained in the deed from John to Joshua Swayne, of March the 1st, 1834, and in the conveyance from Cates to Joshua Swayne, of the hundred and fifty acres bought and paid for by John Swayne.

Wherefore, the decree is reversed, and the cause remanded for another decree conformable with this opinion.

Spring Term
1839.

*Enders &c.*
vs
*Swayne.*

PETITION FOR A RE-HEARING.

[By Messrs. Crittenden & Cates.]

.April 27.

IN the opinion rendered, the Court intimate, " that in " the *preparation* of this case, some of the most *impor-* " *tant* and *characteristic facts* have been permitted to ap- " pear in a very *vague* and *indeterminate aspect;* and there- " fore, this Court has been subjected to some *embarrass-* " *ment* in deducing from the entire record, a *proper* and " *satisfactory judicial conclusion* concerning the matters " litigated." This intimation is fully concurred in by the counsel of defendants in error; and believing, as they sincerely do, that " *ignorance, carelessness* or *acci-* *dent* " in the management of the case in the Circuit Court has tended more, in the mind of this Court, to su- perinduce the assumption of " *seven facts* or *circum-* *stances* " of a *fraudulent intent* on the part of John Swayne, in the conveyance of the mill property, and the purchase of the one hundred and fifty acres of land from Cates, than any fact or circumstance in the record, have induced the counsel respectfully to ask a reconsid- eration of the opinion rendered. There appears in the mind of the Court, and which pervades the entire opin- ion rendered, that two facts are established: 1st. That John Swayne was, in a short time after he commenced the mercantile business at Columbus, possessed of a " *large, extensive* and *valuable real estate.*" 2d. That this *valuable real estate,* together with an extensive stock of goods, " *suddenly vanished,*" without being in any man- ner accounted for. The counsel, with great care and anxiety, have examined the record, and no where find any fact conducing to show that all the real estate in-

cluded in the thirteen deeds exhibited, exceeded in value
five thousand five hundred and eight dollars, (see the
deeds, and depositions of Edrington and Basey;) and the
only conveyances ever pretended to be attacked in the
contest in the Circuit Court, were the conveyances of
the mill property of 1st March, 1834, and the one from
Cates to Joshua, of the 4th September, 1834. The land
on which the mill property stands, was a donation by
the trustees of Columbus, to Edrington and Swayne,
for which they paid nothing. The value of the one
hundred and fifty acres of land purchased by John, for
Joshua, of Cates, was six hundred dollars, and the
amount paid trustees for Joshua, for thirty eight lots,
was only one hundred and seventy eight dollars. Here
then, we have the sum of seven hundred and seventy
eight dollars, as being the value of all the real estate
ever bought or paid for by John, while in business at
Columbus, and even this was bought and paid for, not
for himself, but his brother.

Again: he has faithfully accounted for the disappear-
ance of his stock of goods, not only by his answer, but
the depositions of two persons, who were his clerks and
agents while in business, speak positively to the fact.
Much of the stock of goods was expended in building
the mill: to wit, five thousand dollars. Graham of New
Orleans, to whom John shipped produce, appropriated to
his own use seven thousand dollars and upwards; and
much of the stock of goods went to the payment of his
debts, he being largely indebted at the time he com-
menced business at Columbus.

The Court, in the opinion rendered, intimate that,
as the conveyance from John to Joshua, of the mill
property, was made at a " suspicious and trying moment,
and when conveyee was in city of New York," &c.
" and the *strange fact* that the vendor, in the *absence* of
the vendee, inserted and acknowledged a larger consid-
eration than had been given;" all of which " has not
been explained," &c. The counsel, with due respect
to this intimation of the Court, have been able to find
a full, clear and honorable explanation, in the answers
of John and Joshua, and also the depositions in the

cause, of this transaction. It will be found in the re-
cord, uncontradicted and unimpeached, that in the month
of November, 1833, John, in consideration of three
thousand nine hundred dollars, sold to Joshua, the mill
property, and executed to him a bond for a conveyance
whenever a title thereto could be obtained from Ed-
rington, who was the *joint owner* with John; and that
immediately after the sale, Joshua took the entire control,
management and possession of the mill property; and
that, on the very day that the conveyance from Edring-
ton to John was executed, the deed from John to Joshua
was executed, and duly acknowledged and admitted to
record. But, say the Court, the *absence* of Joshua, the
*date* of the deed, and it purporting to be five thousand
six hundred dollars, when in truth only three thousand
nine hundred dollars, are facts and circumstances con-
ducing to prove a fraudulent intent. How often is it
the case that men capriciously name a consideration
of one dollar, when hundreds passed? How often is it
the fact, that vain ignorance and weakness cause men
to swell the consideration in deeds to thousands, when
in fact only hundreds, and perhaps nothing, has passed?
But in this matter, it was either a mistake in the drafts-
man, or the object was that, as the mill property cost
that sum, and had turned out unprofitable, a large con-
sideration expressed in the deed, might aid his brother
in a future sale of the property; as very many persons
are *weak* enough to be induced to purchase an article,
provided it cost a large sum, that otherwise would not
purchase. But why are those slight and airy circum-
stances tortured into signs and badges of fraud, and
thereby establish a *fraudulent intent* on John? Was not
the sale of the mill property made long anterior to the
institution of any suit by the creditors of John, or his
failure in business? Was there not a good and valuable
consideration paid and received by John? and did not
the mill property pass instanter into the hands of
Joshua, and so continue up to the commencement of
this suit? Was not the deed made anterior to any suit
against John, and duly acknowledged and recorded?
And are all these *ancient legal evidences* of innocence,

fairness and honesty, *to yield* up their weight and influence on the mind of the Chancellor, and become as *feathers* in the scales of justice?

The Court remark—"It would seem that the legal " title to all the real estate bought by John Swayne, " and which was *various* and *apparently extensive*, passed " within a few months into the hands of his brother, " Dr. Joshua Swayne, a *young* and *single man*, then but " *recently settled* at Columbus." With due respect to the Court, the counsel find nothing in the record that would justify the assumption of facts as intimated. The facts in the record are, that, in the fall of 1832, John purchased a large stock of goods in New York, and emigrated to Kentucky, and in the same year settled at Columbus, and commenced business as a merchant. That, in the spring of the year 1833, six months after John's settlement, Joshua, a practicing physician, aged about twenty eight years, brought with him from the State of Tennessee nine thousand dollars in property and money, and also settled at Columbus; and there, besides the benefits of an extensive practice in his profession, made and realized large sums of money by trading in the produce of the country to the South, and extensive speculations in real estate. The only " various and *extensive real estate*" ever purchased by John, was the purchase made for the benefit of Joshua and others, of town lots, to the value of one hundred and seventy eight dollars, and the purchase of one hundred and fifty acres of Cates, to the value of six hundred dollars. And if *youth, celibacy* and *brotherhood* are deemed by the law of the land, disqualifications for one brother to purchase, buy or sell to the other, and that a combination of *these three* are evidence of a *fraudulent intent*, then will the counsel submit to the cruel, and harsh imputation of fraud thrown out by counsel in the argument of this cause, and countenanced in the opinion rendered.

The counsel have conceived that the *intention* with which a deed is executed makes it *fraudulent* or otherwise, and that " *circumstances* or *facts*" are material and important *only* in the degree in which they *conduce* to the establishment of the intention; and in this opinion

of the law, we are fully supported by the adjudged cases upon the statute of frauds &c. both in England and this State.    There is certainly nothing unlawful or dishonest in one brother buying or selling to a brother; or one brother paying to another brother, with property, a debt due in money.    There is no fraud, unlawfulness or dishonesty, in one man paying one creditor before another; nor is there any wrong or dishonesty in securing the payment of the debt of one creditor in preference to others.    See 3 *Mon.* 4.

But there appears to be none of the ancient shields of protection to the innocent allowed the Swaynes in their defence.    They are called to answer, and every word they utter in defence, that can, by the workings of a fruitful imagination, be tortured into evidence of guilt, is brought in judgment against them; and all that they said in explanation or in justification of their conduct, has been passed over as unworthy of remark, notwithstanding each fact of explanation and justification in their answers, is fully established by proof.

But what is the operation and result of the opinion rendered?    It is that, although the facts as proved, clearly show fairness and honesty and good faith on the part of the defendants—yet, as they had negligent and unskilful attorneys to prepare their defence; and as the Circuit Court led them into an error by passing judgment in favor of the soundness of their answers, Joshua Swayne is forced to yield up his property, for which he has paid a fair and valuable consideration, for the purpose of satisfying the hunger of a rapacious creditor of his brother John.    If the present opinion stands unaltered, the reputation of two highminded and honorable men is rendered up as a sacrifice to the unskilfulness of their attorneys, and the errors of Circuit Courts.

In conclusion, the following cases adjudged, are referred to: 6 *Mass. T. R.* 339; 3 *John. Ch. Ca.* 458; 3 *Cranch,* 89; 5 *John.* 335.

Wherefore, a re-hearing is solicited &c.

*Crittenden and Cates,*
*for defendants.*

Spring Term
**1839.**

RESPONSE TO THE PETITION.

*May 6.*

[By the Chief Justice.]

THE petition does not notice the most important facts shown by the pleadings, and which present a strong color; nor does it notice the fact that Swayne the elder frequently superintended the steam mill, as ostensible owner, after the conveyance to Swayne the younger; nor does it notice availably the fact, that all the visible estate of the debtor party passed from him, and not to his creditors, within a few months, and most of it into the hands of his brother.

We do not know, from the record, the precise value of the mill and land and *numerous* town lots. But we repeat that this property was not only very various, but apparently very extensive; and doubtless, it was, prospectively at least, deemed very valuable. And, as to the stock of goods, we also *repeat*, that there has been no satisfactory account; some of the goods may have been appropriated to the purchase of the produce consigned to the commission merchant at New Orleans; but how much was so used, or what disposition was made of the residue, the record does not satisfactorily show.

Now, considering the general facts grouped in the opinion, it does seem to us that, if this *whole* transaction between these brothers, should be permitted to defeat creditors *altogether*, but few creditors need ever incur the trouble and expense of prosecuting suits in Chancery for vacating colorable conveyances by their debtors, unless the latter *and* their conveyees will do, what was never done in such a case—that is, magnanimously acknowledge that the conveyance was *ostensible only.*

We have not imputed to the Swaynes corrupt, or even dishonorable, *motives.* They may have done only what *they* considered perfectly fair and moral, for the purpose of preventing *sacrifice* merely. But the code of legal ethics will not sanction *any contrivance* for either defeating or *delaying bona fide* creditors.

The most charitable construction we feel authorized to give to the transaction between the brothers, as to the mill, and the tract of land, is that its object, as well as its effect, was to *delay* the creditors of the elder Swayne. And, as long as the record remains as it is now, no argument could change this opinion.

Wherefore, the petition is overruled.